UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

TODD McMURRAY,

                          Plaintiff,                      Civil Action No.: 13-cv-10496
                                                          Honorable Robert H. Cleland
                  v.                            Magistrate Judge David R. Grand

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                          Defendant.

_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [12, 16]

Plaintiff Todd McMurray brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions that have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.      RECOMMENDATION

For the reasons set forth below, the Court finds that the Administrative Law Judge ("ALJ") properly evaluated and weighed the record evidence and assessed McMurray's credibility. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [16] be GRANTED, McMurray's motion [12] be DENIED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

## II.    REPORT

### A.    Procedural History

On June 8, 2009, McMurray filed applications for DIB and SSI alleging disability as of September 24, 2007.  (Tr. 20; 136).[1]  Both claims were denied initially on October 19, 2009.  (Tr. 71-78).  Thereafter, McMurray filed a timely request for an administrative hearing, which was held on February 22, 2011 before ALJ Deborah Rose.  (Tr. 37-68).  McMurray, represented by attorney Patrick Marutiak, testified, as did vocational expert ("VE") Bonnie Ward.  (*Id.*).  On March 23, 2011, the ALJ found McMurray not disabled.  (Tr. 17-34).  On June 29, 2012, the Appeals Council denied review.  (Tr. 7-11).  McMurray filed for judicial review of the final decision on February 7, 2013.  [1].

### B.    Background

#### 1.    Disability Reports

In an undated disability report, McMurray reported that he is 6'2" tall and weighed 342 pounds.  (Tr. 141).  The conditions preventing him from working are sleep apnea, a broken back, knee problems, nerve damage and neuropathy of the legs, nerve damage of the arms, bulging discs in the neck and lower back, and tendonitis in the left elbow.  (Tr. 142).  McMurray reported that his conditions prevent him from walking, sitting or standing for long periods of time and climbing stairs.  (*Id.*).  He also reported needing assistance with personal care such as showering, and that it is difficult to put on socks and shoes.  (*Id.*).  He reported difficulty falling asleep due to his conditions.  (*Id.*).  He reported that he stopped working because he "[o]ut on the road

---

[1] It appears that McMurray had also previously applied for benefits on July 21, 2008, an application which was subsequently denied.  (Tr. 130-36).  However, neither party addresses the effect of this previous denial, nor is it addressed in the ALJ's decision, thus the Court does not address it here.  Moreover, while McMurray's present application originally stated an alleged onset date of September 24, 2008, this was deemed at the hearing to be a typographical error and that his true alleged onset date was September 24, 2007.  (Tr. 136; 47-48).

working and came home for son to go to school." (*Id.*).

McMurray reported treating with several physicians, a therapist and a pain doctor. (Tr. 145-46). He reported taking a number of medications including morphine for pain, Neurontin for nerve damage, tizanidine for tight muscles and Zoloft for depression. (Tr. 148). He did not report any side effects to his medications. (*Id.*).

In a June 22, 2009 field office report, the interviewer noted that McMurray appeared to have difficulty with sitting and standing, in that he had to stand and stretch frequently, and complained about how hard the interview chair was. (Tr. 153).

In an undated function report, McMurray reported that his day consists of taking a shower, taking medicine, eating breakfast, playing on the computer, eating lunch, visiting family, eating dinner, watching television and going to bed. (Tr. 171). He reported that he used to be able to perform concrete work, run and exercise but that he cannot do those things with his conditions. (Tr. 172). He also reported having sleep apnea and a pinched nerve which interfere with his ability to sleep. (*Id.*). He reported difficulty with personal care including bathing below the waist, wiping after using the toilet, and putting on socks and shoes. (*Id.*). He reported doing no cooking because his wife does it. (Tr. 173). He also does not perform housework because it is "too hard" and he cannot "stand long." (Tr. 174). McMurray reported leaving the house daily and that he could go out alone, drive and ride in a car. (*Id.*). He can also manage money. (Tr. 174-75). His hobbies consist of hunting, basketball and poker, but the only one he can engage in currently is poker, which he does on a daily basis with others. (Tr. 175). He also goes to his mother's house regularly. (*Id.*). He feels he is more quiet and depressed since his conditions began. (Tr. 176).

McMurray reported that his conditions interfere with his ability to lift, squat, bend, stand,

reach, walk, sit, kneel and climb stairs. (*Id.*). He can walk ten minutes before needing to rest ten minutes. (*Id.*). He can also pay attention "all the time," has no problem finishing tasks, and does "fine" with both written and oral instructions. (*Id.*). He reported no trouble with authority figures or changes in his routine, but reported handling stress "bad[ly]." (Tr. 177). In an undated disability appeals report, McMurray reported no change in his conditions. (Tr. 182-85).

### 2.    *Plaintiff's Testimony*

McMurray testified at the hearing that he used to work mainly in concrete, but that he stopped when his brother had a stroke and McMurray became his caregiver. (Tr. 46). He ended his employment as his brother's caregiver in September 2007 due to his conditions. (Tr. 48). McMurray testified that even though he suffers from numerous conditions, the worst is the pain in his knees and back. (Tr. 49). He testified that he takes morphine for the pain daily, and that the medication keeps his pain level at about a 2 out of 10. (Tr. 49; 56). Without the medication, McMurray testified that his pain is 10/10. (Tr. 56). He testified that his left knee is worse than his right and that it will occasionally lock up on him without notice, which happens about twice a year. (Tr. 49-50). He also testified to numbness and aching in his legs due to nerve damage, as well as swelling due to water retention. (Tr. 50). He testified that he was recently diagnosed with diabetes. (*Id.*).

McMurray testified that his pain makes it uncomfortable to sit for more than 10-15 minutes and stand more than 5-10 minutes. (Tr. 51). He can walk about 15-20 minutes a day, but testified that the more he walks, the worse he feels. (*Id.*). He testified that if he does too much on one day, he will feel it the next day, giving the example of shoveling his driveway, a task his nephew would normally perform. (Tr. 52; 54). He testified that he no longer hunts due to his condition. (Tr. 55). He has to lie down at least once and as many as four times a day for at

least 30 minutes.  (*Id.*).  He also testified to days where he lies in bed all day due to pain, which occur about three times a month.  (Tr. 56).  He testified that he stretches and exercises to relieve the pain, and that he has gained about 60 pounds since he stopped working.  (Tr. 53).

McMurray testified that he suffers from side effects of his medication, including dizziness and hot flashes.  (Tr. 57).  He also testified that his depression interferes with his ability to work because he has angry outbursts as a result of depression and anxiety.  (Tr. 62-63).

### 3. Medical Evidence

#### a. Treating Sources

##### i. Primary Care Physicians

On October 8, 2008, McMurray presented to his primary care practice asking for something to calm his nerves.  (Tr. 234-35).  He reported being on Zoloft, and was recommended for follow-up after being seen during "grand rounds" for his knees.  (*Id.*).  During a follow-up telephone conversation on November 8, 2008, McMurray was informed he was not a candidate for knee replacement surgery, but was recommended to try injection therapy.  (Tr. 238).  Arthroscopy would be considered if injections did not provide satisfactory results.  (*Id.*).

McMurray began care with a new primary care physician, Dr. Amy Blaising-Wallace, on August 10, 2009.  (Tr. 291).  He reported feeling well with minor complaints, although he also reported a pain level of 8/10 and being out of medication for the last two months.  (Tr. 291-92).  He reported sleeping 8 hours a night and also complained of a rash.  (Tr. 291).  He did not report any medication side effects, leg pain or swelling.  (Tr. 292).  An exam revealed normal posture and gait and no edema.  (*Id.*).  Blood work was ordered and he was given a cream for his rash.  (Tr. 293).

At his annual exam on August 17, 2010, McMurray reported feeling well with no

5

complaints.  (Tr. 378).  He reported that he exercises 3-4 times a week and sleeps 10 hours a

night.  (*Id.*).  He reported no joint stiffness or muscle cramps and that his pain was 2/10.  (Tr.

378-79).  He did report fatigue and edema when his blood sugar was elevated.  (Tr. 379).  Upon

exam, his pulse and reflexes were normal and he had normal bilateral leg and arm strength.  (*Id.*).

He was diagnosed with type 2 diabetes and medications were prescribed.  (Tr. 380).  At a follow-

up on September 21, 2010, McMurray reported feeling well despite his recent diabetes diagnosis.

(Tr. 407). He reported exercises daily through walking.  (*Id.*).  A sensory exam was normal and

there was no swelling of the extremities.  (Tr. 408).  Dr. Wallace managed his medications and

counseled him on diet and exercise.  (Tr. 409).

McMurray returned to Dr. Wallace again on January 19, 2011 for a follow-up.  (Tr. 428).

He reported back pain that was stable with no severe pain.  (*Id.*).  He was also exercising and

walking daily for his diabetes.  (*Id.*).  He reported elbow pain due to a bar incident[2], but that

otherwise he was feeling well.  (Tr. 428-29).  An exam of his left elbow revealed swelling and

tenderness, but with normal strength, sensation and joint stability.  (Tr. 430).  There was also no

erythema, deformity or crepitus noted.  (*Id.*).  An x-ray taken of his left elbow was normal.  (Tr.

432).

### ii.     *Dr. Margaret Snow*

McMurray began treating with Dr. Margaret Snow for chronic pain on August 11, 2008.

(Tr. 240-42).  He reported being leery about pain medication, claiming it "messes with [the]

mind."  (Tr. 240).  However, he believed he "would do well" on either Vicodin or Tylenol 3.

---

[2] According to the medical record, McMurray was outside a bar when he was struck by an
assailant.  (Tr. 428).  He fell, and struck his elbow on the ground.  (*Id.*).  He alleged that he was
arrested for being drunk and disorderly, and that when the police took him to jail, they choked
him and kicked him in the ankle.  (*Id.*).  McMurray denied being drunk, claiming he had drank
only 1/3 of a beer.  (*Id.*).

(*Id.*).  He complained of gradual onset back pain that was sharp and shooting and had been worsening.  (*Id.*).  He reported the pain as located in his lower back and radiating to the lateral aspect of both legs and feet.  (*Id.*).  It was aggravated by "bending, twisting, lifting, sitting, standing and walking," and was relieved by "bedrest and medication."  (*Id.*).  He also reported stiffness, urinary incontinence and paresthesias in his legs.  (*Id.*).  His back pain originated with a slip and fall in 1996.  He reported previous treatment including pain management and physical therapy, but no surgery or assistive devices.  (*Id.*).  The pain interfered with McMurray's ability to walk and exercise, and minimally with his ability to sleep. (*Id.*).  He rated his back pain as a 6 out of 10.  (*Id.*).

McMurray also reported other pain.  (*Id.*).  He reported dull aching neck pain that was aggravated by lifting and bending, and relieved by changing position.  (*Id.*).  He reported the severity of this pain as 6/10.  (*Id.*).  He further reported suffering from shoulder pain, also currently 6/10, that was associated with muscle weakness and painful and decreased range of motion.  (*Id.*).  The pain was aggravated by physical activity, overhead activity and lifting, and was not relieved by anything.  (*Id.*).  Finally, McMurray reported sharp, stabbing knee pain over the entire knee, aggravated by any movement.  (*Id.*).  He rated this pain also as a 6/10.  (*Id.*).

Upon exam, Dr. Snow noted an antalgic gait, decreased Achilles reflexes but normal knee reflexes.  (Tr. 242).  There was tenderness present in McMurray's lumbar spine, as well as an abnormal range of motion ("ROM") (noting an asymmetric movement into flexion).  (*Id.*).  A double straight leg lowering test registered 4/5.  (*Id.*).  Dr. Snow diagnosed McMurray with lumbar intervertebral disc disorder with myelopathy, cervical disc disorder with myelopathy, derangement of the meniscus and idiopathic peripheral neuropathy not otherwise specified.  (*Id.*).  She prescribed Ultram and morphine, and increased McMurray's previous dosage of Neurontin.

7

(*Id.*).

At a follow-up on August 25, 2008, McMurray reported increasing his dosage of morphine on his own initiative. (Tr. 243). He also reported that the Ultram was reducing the swelling in his ankles and knees. (*Id.*). He reported being prescribed Wellbutrin after an incident at physical therapy. (*Id.*). He rated the pain in his back, neck, left shoulder and knee as 6/10. (*Id.*). He anticipated that therapy would help his back. (*Id.*). Upon exam, Dr. Snow noted normal lumbar strength, but with tenderness present, and an abnormal ROM. (Tr. 245). His bilateral lower extremities showed normal range of motion, strength and muscle girth. (*Id.*). Dr. Snow increased McMurray's morphine dosage. (*Id.*).

At a September 8, 2008 follow-up, McMurray reported that physical therapy was causing pain in his middle upper and lower back. (Tr. 246). He reported that his knees and his back were "killing him." (*Id.*). He did not feel that Wellbutrin was working and reported having no patience. (*Id.*). He reported tight calf muscles, pain in his right arm, and pain in his neck, back, shoulder and knee all rating a 6/10. (*Id.*). He reported that he was soon to get a second opinion regarding his knees. (*Id.*). Upon exam, McMurray was noted to have a depressed and irritable affect. (Tr. 248). His posture and reflexes were all normal. (*Id.*). Dr. Snow ordered a nerve study after noting that an EMG was "negative for acute denervation." (*Id.*). She also managed McMurray's medications. (*Id.*).

McMurray returned to Dr. Snow on September 16, 2008, to discuss medication for depression, which he associated as being related to his chronic pain. (Tr. 249). He reported "doing good with pain relief" and that his pain in all areas remained at 6/10. (*Id.*). Dr. Snow noted McMurray's mood and affect as agitated and depressed. (Tr. 251). She discontinued his Wellbutrin and prescribed Zoloft. (*Id.*). A nerve conduction study of the cervical spine

conducted the same day revealed "remote nerve root injury in the C7-C8 distribution on the left, without evidence of acute denervation" and one conducted of the ulnar nerve revealed "exam consistent with right ulnar axonal neuropathy, with sparing of motor fibers." (Tr. 286). It was recommended that McMurray use padding at his elbow and avoid flexion, and continue with "pain management program with opioid and nerve pain medications." (*Id.*).

At an appointment the following week on September 22, 2008, McMurray reported soreness and bruising from physical therapy. (Tr. 252). He reported that Zoloft was helping him. (*Id.*). He scored all of his pain at a 7/10. (*Id.*). Upon exam, McMurray was noted to be able to tandem walk, and walk on heels and toes. (Tr. 253). His mood and affect were depressed and insight appropriate. (*Id.*). Dr. Snow added a diagnosis of ulnar nerve injury and managed his medications. (Tr. 254). McMurray returned on October 7, 2008, complaining of worsening pain and seeking an increase in his medications. (Tr. 255). He reported not moving and "doing a lot less the last couple of weeks." (*Id.*). He rated his back and knee pain as a 9/10 and his neck and shoulder pain as a 7/10. (*Id.*). Upon exam he was able to tandem walk and walk on heels and toes. (Tr. 257). He was in no acute distress. (*Id.*). His mood was normal. (*Id.*). Dr. Snow continued McMurray's morphine dosage, increased his Neurontin dosage, and ordered x-rays. (*Id.*). She noted that his ulnar nerve injury was "without clinical motor weakness." (*Id.*). X-rays taken of McMurray's pelvis and right knee were normal. (Tr. 223-24). X-rays of his left knee revealed suprapatellar calcification and "mild degenerative marginal spurrings." (Tr. 222). An x-ray of his lumbar spine revealed degenerative disk space narrowing at L1-L2 and L2-L3. (Tr. 225).

At an October 21, 2008 appointment, McMurray reported "[d]oing much better," and expressing a desire to continue with physical therapy. (Tr. 258). He rated his back and neck

pain as 5/10 and his shoulder pain as 3/10.  (*Id.*).  His tandem walking and toe and heel walking were normal.  (Tr. 259).  Dr. Snow managed his medications.  (Tr. 260).  He reported the same degree of pain at an appointment on November 26, 2008, except that he also reported knee pain as 9/10, and that he was receiving fat injections in his knees.  (Tr. 261).  His medications were managed at this appointment.  (Tr. 263).  At a January 7, 2009 appointment, McMurray reported less back and neck pain, rating both, as well as shoulder pain, at a 2/10.  (Tr. 264).  He continued to rate his knee pain at 9/10.  (*Id.*).  His medications were again managed.  (Tr. 266).  He reported the same amount of pain at a February 19, 2009 appointment, although he noted that he was now getting more pulsating headaches due to neck pain.  (Tr. 267).  Dr. Snow managed his medications.  (Tr. 269).

On March 19, 2009, McMurray presented to Dr. Snow complaining of worsening pain with the weather.  (Tr. 270).  He reported a "rough 3 days when the weather went from cold to warm."  (*Id.*).  He rated all areas of pain at a 4/10.  (*Id.*).  His tandem and heel and toe walking were normal and Dr. Snow managed his medications.  (Tr. 272).  McMurray returned on April 16, 2009, reporting that he was "[t]rying to keep himself busy with housework and yard work." (Tr. 273).  He rated all areas of pain at a 4/10, while noting his left knee had "popped out 3 times since last visit with the increase of activity."  (*Id.*).  An examination revealed a normal tandem and heel and toe walk, and an abnormal range of motion in his left knee, noting very tight quads. (Tr. 275).  Dr. Snow prescribed tizanidine and continued McMurray's other medications.  (*Id.*).

At an appointment on May 13, 2009, McMurray reported an increase in pain, especially in his knees and back.  (Tr. 276).  He reported benefits of tizanidine with regard to his sleep. (*Id.*).  He rated his back pain as 6/10 and his knee pain as 4/10.  (*Id.*).  Dr. Snow increased his morphine dosage.  (Tr. 277).  At his next appointment on June 10, 2009, McMurray reported that

the increase in his paid medication was "great."  (Tr. 279).  He reported an increase in elbow pain and a fear of exercising.  (*Id.*).  He rated all areas of pain at a 2/10.  (*Id.*).  He reported no side effects as a result of his medication.  (Tr. 280).  Dr. Snow talked to McMurray about weight loss and managed his medications.  (Tr. 281).

McMurray returned on July 8, 2009, reporting that the increase in morphine was having positive results.  (Tr. 282).  However, he reported that his right knee had been giving out recently, even just walking across the street.  (*Id.*).  Despite this, he rated all areas of pain at a 2/10.  (*Id.*).  He reported no side effects to his medications and Dr. Snow managed the same. (Tr. 284).  At a follow-up on August 6, 2009, McMurray rated all of his pain at a 0/10, reported no side effects, and Dr. Snow managed his medications.  (Tr. 373-75).

In an October 1, 2009 pain self-assessment, McMurray rated his current and best pain levels at a 2/10 and his worst pain at a 4/10.  (Tr. 371).  He reported that his pain extremely interfered with his ability to work and enjoy life, that it greatly interfered with his daily routine and ability to concentrate, moderately interfered with his ability to sleep and rest, but did not interfere at all with his social functioning and family activities.  (*Id.*).  McMurray reported that his medication regimen did not interfere with his ability to drive, work, or perform normal living functions.  (Tr. 372).  He noted a new pain on the inside of his knee.  (*Id.*).  At an appointment with Dr. Snow on the same day, McMurray rated all his pain at a 2/10.  (Tr. 367).  He reported no side effects of medications.  (Tr. 369).  An exam revealed no acute distress, but an antalgic gait.  (*Id.*).  McMurray also displayed an abnormal ROM of his lumbosacral spine, and tenderness, deformity and crepitus in his left knee.  (*Id.*).  Dr. Snow assessed that McMurray's "multiple medical conditions [ ] limit his ability to work" and that she did not "feel he is capable of meaningful work at this time."  (*Id.*).  She managed his medications.  (*Id.*).  The same report

and assessment were generated at appointments on October 29 and November 19, 2009, except that at the November appointment, McMurray's gait was considered normal and he was able to tandem and heel and toe walk without difficulty.  (Tr. 360-66).

In a December 21, 2009 pain self-assessment, McMurray rated his current pain at a 2, his best at a 0 and worst at a 6.  (Tr. 358).  He reported great interference with his ability to work, moderate interference with his daily routine, ability to sleep, concentrate, and enjoy life, and no interference with his social functioning.  (*Id.*).  He noted that his pain moderately causes him to be irritable, anxious or depressed.  (*Id.*).  McMurray reported no side effects of his medications, and that he did not perform housework.  (Tr. 359).  He also reported new back pain for the past two days.  (*Id.*).  At an appointment on January 21, 2010, McMurray reported pain at 2/10 and no medication side effects.  (Tr. 355-57).  An exam revealed a normal gait, and the ability to tandem and heel and toe walk.  (Tr. 357).  Dr. Snow also noted an abnormal ROM in McMurray's lumbosacral spine.  (*Id.*).  She continued to assess that he was incapable of "meaningful work" due to his conditions, and managed his medications.  (*Id.*).  At a follow-up on February 18, 2010, the treatment records were ostensibly identical, except that McMurray reported an increase in shoulder and back pain to a 4/10.  (Tr. 352-54).  However, he also reported he was "doing well." (Tr. 352).

At an appointment on March 16, 2010, McMurray acknowledged using "a few extra pills over the last 3 days" and that he was taking Neurontin four times a day instead of three.  (Tr. 349).  He was advised to step down his usage.  (*Id.*).  He rated all his pain at a 2/10, except his shoulder pain which he rated at a 4.  (*Id.*).  He reported no side effects of medication.  (Tr. 351). His gait was normal upon examination, and Dr. Snow again assessed him incapable of "meaningful work," and managed his medications.  (*Id.*).  McMurray completed another pain

12

self-assessment on March 31, 2010, rating his current and best pain at a 2/10 and worst at a 6/10. (Tr. 347).  He reported only moderate interference with all areas of life, including ability to work, concentrate, and enjoy life.  (*Id.*).  He reported that he was now performing his own housework and that he suffered no side effects of his medication.  (Tr. 348).  He reported no new pain and no additional problems with sleep, concentration or depression.  (*Id.*).  At an April 15, 2010 appointment, McMurray reported doing well with the weather change and that all his pain was 0/10.  (Tr. 343).  He reported no side effects of his medication and was found to be in no acute distress.  (Tr. 345).  His gait, tandem walking and heel and toe walking were normal, except there was a slight loss of balance reported secondary to his knees.  (*Id.*).  An exam of his lumbosacral spine revealed an abnormal ROM.  (*Id.*).  Dr. Snow again found McMurray incapable of meaningful work and managed his medications.  (*Id.*).  She noted he was "functioning well on medium dose morphine."  (*Id.*).

At a May 13, 2010 appointment, McMurray reported attempting to do more, including cutting the grass.  (Tr. 339).  He rated all pain at a 0/10 and reported no medication side effects. (Tr. 339; 341).  An examination remained unchanged from his last appointment and Dr. Snow managed his medication and found him incapable of meaningful work.  (Tr. 341).  McMurray returned in June 2010 reporting that he was "doing good," exercising and cutting the grass, but not overdoing it.  (Tr. 403).  He rated all pain at a 0/10 and reported no side effects.  (Tr. 403-404).  An exam revealed a normal gait, normal heel and toe walks and normal heel-to-shin.  (Tr. 404).  Nevertheless, Dr. Snow found still McMurray incapable of meaningful work and managed his medications.  (Tr. 405).  At a July 2010 appointment, McMurray reported playing poker "on line all the time," "[t]rying to do more and more," and being "more active."  (Tr. 400).  He rated his pain at a 2/10, and the remainder of the notes was unchanged from his last appointment.  (Tr.

400-402).  McMurray's pain level and condition remained unchanged at his August 11, 2010 appointment.  (Tr. 396-99).

At an August 23, 2010 appointment, McMurray revealed that he was traveling to Louisiana to pick up a truck.  (Tr. 393).  He was "angry and agitated" at this appointment and rated his pain at a 4/10.  (Tr. 393-95).  He continued to report no medication side effects.  (Tr. 395).  He was found to be in acute distress and assessed as unable to perform meaningful work. (*Id.*).  His medications were managed.  (*Id.*).  At a September 2010 appointment, McMurray reported not traveling to Louisiana and that his son picked up the truck instead.  (Tr. 389).  He reported "paying for" time he spent walking the river looking for his sister's purse and that he took four pain pills the day he picked up his most recent prescription.  (*Id.*).  He continued to rate all pain at a 2/10.  (*Id.*).  He reported no medication side effects.  (Tr. 390).  He was found to be in acute distress, but able to walk on toes and heels.  (*Id.*).  He rated a 5/5 on a double straight leg lowering test.  (*Id.*).  His medications were managed and he was found incapable of meaningful work.  (Tr. 391).

At his October 2010 appointment, McMurray reported walking and stretching each day, feeling that his energy level was better, and reporting a pain level of 2/10.  (Tr. 386).  He reported no medication side effects.  (Tr. 387).  He was found to be in acute distress, but had a normal gait and was able to walk on toes and heels.  (*Id.*).  A double straight leg lowering test was 4/5.  (*Id.*).  His medications were managed and he was deemed incapable of meaningful work.  (Tr. 388).  His condition remained unchanged at his November 2010 appointment.  (Tr. 421-23).  However, at his December 2010 appointment, McMurray reported sciatic nerve trouble and that he could "barely walk."  (Tr. 418).  Despite this, he continued to rate his pain at 2/10. (*Id.*).  He again reported no side effects, his medications were managed and he was found

14

incapable of meaningful work. (Tr. 420). His condition remained unchanged at his January 2011 appointment, except that he incurred a new injury to his left ankle after an encounter with police. (Tr. 415-17). An exam of the ankle revealed tenderness and pain, but no swelling as McMurray had reported. (Tr. 416). Dr. Snow recommended an aircast. (*Id.*). She also noted that McMurray had "violated [his] pain agreement by drinking alcohol," missed an appointment, and had stopped seeing his therapist, which she "strongly recommend[ed]" he reconsider. (Tr. 417).

McMurray continued to report pain of 2/10 at his February 3, 2011 appointment, except that he reported his medications were "not touching" his left ankle pain. (Tr. 412). The remainder of his treatment notes were unchanged from his last appointments, except that an exam of his ankle revealed a normal ROM and joint stability, no deformity, but the presence of tenderness. (Tr. 413). McMurray was referred to orthopedics for his ankle. (Tr. 414). At a follow-up on February 24, 2011, McMurray continued to report pain at 2/10 and no side effects. (Tr. 461-63). Although he was deemed "in acute distress," his gait was normal and his medications were simply managed. (Tr. 463). No other exam was performed. (*Id.*). At a March 2011 appointment, McMurray's condition and pain level were unchanged, although he was impaired in his ability to heel and toe walk secondary to right ankle pain. (Tr. 458-60). His left ankle had a normal range of motion with the aircast. (Tr. 459). His condition and pain level again remained unchanged at an April 2011 appointment, except that he was assessed pain and tenderness in his left elbow, but with a normal ROM. (Tr. 455-57). He was diagnosed with tennis elbow and prescribed Naproxen and a splint. (Tr. 457).

At a June 2, 2011 appointment, McMurray reported increased back pain, although he continued to rate his pain at a 2/10 and reported no medication side effects. (Tr. 451-53). Upon

exam he was found in acute distress initially, which improved after a muscle energy technique was applied.  (Tr. 453).  He was able to walk on heels and toes, but had right ankle pain secondary to injury.  (*Id.*).  An exam of his pelvis revealed an unstable joint.  (*Id.*).  He was diagnosed with a sacral somatic dysfunction and a follow-up was recommended.  (*Id.*).  At his July 2011 appointment, McMurray continued to report pain of 2/10, but no longer had ankle pain.  (Tr. 448).  He reported no medication side effects.  (Tr. 450).  His acute distress upon exam was improved after application of a muscle energy technique, although he had an antalgic gait.  (*Id.*).  He was able to walk on heels and toes although he continued to have right ankle pain secondary to injury.  (*Id.*).  Dr. Snow found him to be angry and lacking insight and managed his medications.  (*Id.*).  McMurray's condition and assessment remained unchanged at an August 2011 appointment.  (Tr. 445-47).

At a September 2011 appointment, McMurray reported engaging in some exercise, helping a friend with a car, and "[d]oing stuff around t[he] house."  (Tr. 442).  He reported an improved diet to decrease his weight.  (*Id.*).  He rated his pain at a 2/10 with no ankle pain and no medication side effects reported.  (Tr. 442-43).  His gait, tandem walking and heel/toe walking were normal and he was found calm and not depressed.  (Tr. 444).  Dr. Snow managed his medications.  (*Id.*).  At a November 2011 appointment, McMurray rated his back pain at a 4/10 and his neck and knee pain at a 3/10, but admitted he was only stretching and not walking.  (Tr. 439).  He reported no medication side effects and his medications were managed.  (Tr. 440).

### iii.    *Dr. Gary Branch*

McMurray presented to Dr. Gary Branch on March 15, 2011, per a referral for his left ankle injury.  (Tr. 436).  An MRI had revealed "an apparent osteochondral defect involving the talar dome," and a "partial injury to the deltoid ligament."  (*Id.*).  McMurray reported feeling

16

better wearing an ankle brace and, while he had mild pain with walking, indicated "he is essentially pain-free." (*Id.*). An exam revealed no visible deformity, normal flexion and intact stability. (*Id.*). Dr. Branch recommended a new ankle brace, since McMurray had damaged his old one, and an evaluation with a foot and ankle specialist. (*Id.*).

*iv.*      *Mental Health Treatment*

On August 21, 2008, McMurray was evaluated by emergency room personal regarding a threat he made to kill his mother and sister. (Tr. 226). He reported that he did not really mean this, but that he was "just pissed off at all my doctors because I'm fucking tired of it all." (*Id.*). He reported that his brother had died, his wife had a heart attack, and he suffered from chronic pain. (*Id.*). He also reported not taking care of a warrant for his arrest for driving without a license. (*Id.*). He appeared angry, agitated, depressed, frustrated and tearful. (*Id.*). He was prescribed Wellbutrin and recommended to follow-up for an evaluation and counseling. (Tr. 227).

At an initial biopsychosocial assessment, McMurray presented for prior concerns that he had threatened to kill his mother and sister. (Tr. 206). An examination revealed that McMurray was oriented times three, maintained good eye contact, and had clear speech. (Tr. 208). He described himself as depressed and angry. (*Id.*). He was tangential at times and lost track of the conversation. (*Id.*). He admitted past suicidal ideation, but nothing recent. (*Id.*). He was diagnosed with major depressive disorder, recurrent, moderate, rule out post-traumatic stress disorder ("PTSD") and issued a Global Assessment of Functioning ("GAF") score of 55. (Tr. 209). He was referred to outpatient therapy. (Tr. 210).

At a psychiatric evaluation on October 6, 2008, McMurray reported that difficulties with his family had led him to express thoughts of killing his mother and sister. (Tr. 200). He

17

reported discontinuing Wellbutrin and beginning Zoloft but not believing it was helping him. (*Id.*). He reported chronic pain that has increased since being on medication. (*Id.*). He reported low energy and poor concentration due to pain, but good sleep. (*Id.*). He denied any suicidal or homicidal ideation or intent, stating that he would never truly harm his mother or sister. (Tr. 200-201). He reported previously attending anger management classes. (Tr. 201). A mental status exam revealed that McMurray maintained good eye contact and his speech was clear and coherent. (Tr. 202). His thought process was logical and goal-directed and he was cognitively intact. (*Id.*). His affect was restricted, his mood depressed and he appeared dysphoric and angry, but "containing his anger." (*Id.*). He was diagnosed with major depressive disorder, recurrent, moderate, and dysthymic disorder, and to rule out PTSD. (Tr. 203). He was issued a GAF score of 55. (*Id.*). The doctor increased his Zoloft dosage and recommended therapy. (*Id.*).

McMurray did not treat with another mental health provider, according to the records, until November 2011 when he began counseling with the Taylor Life Center. (Tr. 466). He presented with anxiety, depression and anger outbursts. (Tr. 469). He acknowledged the presence of suicidal thoughts but no intent. (*Id.*). He reported being in physical pain, lacking exercise (although he stretches and walks), and reported an inability to walk far or shop without a cart due to pain and weight gain. (Tr. 471-72). An exam revealed that McMurray was cooperative, but resentful and immature. (Tr. 472). His motor activity, gait and posture were normal. (*Id.*). His thoughts were spontaneous and logical, his mood depressed and his affect appropriate. (*Id.*). He was mentally intact. (*Id.*). He was diagnosed with a mood disorder, not otherwise specified, issued a GAF score of 50 and referred for counseling. (Tr. 473). A treatment plan was put in place on December 7, 2011, at McMurray's first therapy session. (Tr. 466-67). On that date his GAF score was 55. (Tr. 467). He reported believing that his pain and

medications were likely central to his mood and anger issues, and he was reported as resistant to the therapist's suggestion of a 12-step program, arguing that 99% of what happened to him throughout his life was not his fault.  (Tr. 466).  There are no further mental health records in the file.

### b.      Consultative and Non-Examining Sources

### i.      September 2008 Physical RFC Assessment

Medical consultant Joyce Cowen completed a physical residual functional capacity ("RFC") assessment for McMurray on September 23, 2008.  (Tr. 189-96).[3]  Based on a review of the records, she found him capable of lifting and carrying 10 pounds, sitting six hours a day and standing for two, with limited pushing and pulling in the upper extremities and only occasional use of foot controls.  (Tr. 190).  She found he could occasionally climb ramps or stairs, stoop, kneel, crouch and crawl, frequently balance, but never climb ladders, ropes or scaffolds.  (Tr. 191).  He should avoid moderate exposure to hazards.  (Tr. 193).  She noted that McMurray's allegation that he could not sit, stand, or walk for more than 5 minutes was not consistent with the medical evidence, but that the evidence did permit a finding that McMurray could be "expected to have some discomfort with prolonged sitting, standing and walking as well as some limitation in lifting."  (Tr. 194).  Thus, she found him "partially credible."  (Id.).

### ii.      September 2009 Physical Consultative Exam

On September 19, 2009, McMurray underwent a physical consultative exam with Dr. R. Scott Lazzara.  (Tr. 297-301).  McMurray reported arthritis, bulging disc, sleep apnea and a broken back.  (Tr. 297).  He reported that he has difficulty putting on socks and shoes, does

---

[3] It appears this RFC assessment was related to McMurray's original disability application, as it predates his present application for benefits.  However, since a subsequent RFC assessment mentions it, (Tr. 317), and it is in the present record, the Court recounts the details here.

vacuum but does not do any yard work.  (*Id.*).  He reported playing computer poker and visiting with friends and family.  (*Id.*).  He further reported being able to alternate between sitting and standing every five minutes, walk about a block and lift 5 pounds.  (*Id.*).  An exam revealed no joint laxity, crepitance or effusion, good grip strength and dexterity, and an ability to get on and off the exam table without difficulty.  (Tr. 298).  There was 20 degree varus deformities in both knees and McMurray could not hop.  (*Id.*).  He could heal and toe walk without difficulty and partially squat with mild difficulty.  (*Id.*).  He had slightly limited range of motion in his dorsolumbar and cervical spines on flexion and extension.  (Tr. 298-99).  Dr. Lazzara also noted that McMurray compensated with a wide-based gait.  (Tr. 301).  He assessed arthritis and recommended weight loss "as some of this is related to his body habitus."  (*Id.*).  Dr. Lazzara issued a guarded prognosis, but noted that the condition "would be somewhat remediable."  (*Id.*).

In a separate supplement report, Dr. Lazzara found that McMurray could perform all routine activities, except that he could not repetitively carry, only occasionally stoop or squat, and climb stairs with help from a railing.  (Tr. 295).  A straight leg raising test was also normal and there was no need found for a walking aid.  (Tr. 296).

### iii.     October 2009 Physical RFC

A physical RFC was issued by a single decision maker (non-medical personnel) on October 9, 2009, finding McMurray capable of lifting, carrying and pushing and pulling 10 pounds, and sitting six hours a day and standing for two.  (Tr. 313).  It also found him capable of occasionally climbing ramps or stairs, balancing, stooping, kneeling, and crouching, but never climbing ladders/ropes/scaffolds, or crawling.  (Tr. 314).  He was to avoid moderate exposure to hazards.  (Tr. 316).  The decision-maker noted that McMurray's "statements regarding his limitations in walking, squatting, bending, standing, reaching, lifting, climbing and kneeling are

not inconsistent with [the medical evidence of record] and are somewhat credible.  [McMurray]
was given a sed[entary] RFC in 2008 and there is no noticeable improvement in [his] overall
medical condition." (Tr. 317).

*iv.     September 2009 Psychological Report*

McMurray was evaluated by Dr. Lois P. Brooks and limited licensed psychologist L.J.
McCulloch for the Michigan department of disability services on September 17, 2009.  (Tr. 303-
311).  He reported mental issues of depression, anxiety and anger secondary to his chronic
physical pain and believed if he was pain free he would have no mental issues.  (Tr. 304).  He
reported constant physical pain in many areas of his body, including his back, shoulders, elbows
and knees.  (Tr. 303-304).  McMurray noted previous mental health treatment in 2008, but that
he stopped going because he could not afford it.  (Tr. 305).  He reported that he sleeps about 12
hours a night, plays poker and talks to friends and family during the day.  (Tr. 306).  He reported
keeping up with the news and television.  (*Id.*).  He reported he is able to shop, prepare meals
and do laundry, but does not perform these activities.  (*Id.*).  He reported vacuuming every day.
(*Id.*).  McMurray reported getting along with his family and friends okay, and responding well to
neighbors, coworkers and supervisors.  (Tr. 306).  He was found to be cooperative and friendly
with the examiner.  (*Id.*).

An exam revealed that McMurray was in physical pain, moaning and groaning, limping
and exhibiting slowness with movement.  (Tr. 307).  He showed pain behavior when engaging in
motor activities.  (*Id.*).  However, he was cooperative, relaxed and friendly, autonomous in
answering questions, and was not exaggerating his symptoms.  (*Id.*).  His thought process was
spontaneous and logical, he had no hallucinations or delusions and was not in acute emotional
distress.  (*Id.*).  "He did seem in significant pain."  (*Id.*).  The examiner found that McMurray

21

was moderately impaired in his ability to respond appropriately to supervision and coworkers, and adapt to changes in the work setting.  (Tr. 309).  She found no severe impairment in his ability to understand, remember and carry out instructions, but there was some subtle problems with mental shifting, attention and concentration.  (*Id.*).

The doctor diagnosed him with major depressive disorder, chronic, recurrent, moderate, cognitive disorder not otherwise specified, and chronic pain disorder.  (Tr. 309).  The evaluator noted that it was difficult to determine whether his mental problems were secondary to his physical pain "which is reacted to with some degree of depression and anxiety."  (*Id.*).  He was issued a GAF score of 60 and a guarded prognosis.  (Tr. 310).

### v.   October 2009 Mental RFC and Psychiatric Review Technique

Dr. Leonard Balunas issued a psychiatric review technique for McMurray on October 17, 2009.  He diagnosed McMurray with a somatoform disorder (specifically pain disorder), major depressive disorder and dysthymic disorder.  (Tr. 324-30).  He assessed McMurray with mild limitations in activities of daily living and social functioning, and moderate difficulties in maintaining concentration, persistence and pace.   (Tr. 334).   He found no episodes of decompensation.  (*Id.*).  He noted that subjective reports did not indicate significant limitations due to mental disorders.  (Tr. 336).  He further rejected the consultative examination, finding it "significantly inconsistent with [the] functional information provided by the claimant, [ ] inconsistent with objective observations contained in the [ ] report and is therefore accorded little weight."  (*Id.*).  He found McMurray "able to perform unskilled work on a sustained basis." (*Id.*).

Dr. Balunas then issued a mental RFC assessment for McMurray, finding him moderately limited in his ability to understand, remember and carry out detailed instructions and maintain

22

attention and concentration for extended periods.  (Tr. 320-21).  He found McMurray capable of performing "unskilled work involving 1 and 2 step instructions with limited need for sustained concentration."  (Tr. 322).

### 4.    Vocational Expert's Testimony

VE Bonnie Ward testified at the hearing.  She first outlined McMurray's previous jobs, finding that they ranged in physical exertion from light to heavy and in skill level from SVP 2-5.  (Tr. 64-65).  The ALJ then asked the VE to imagine a hypothetical claimant of McMurray's age, education, and vocational background who was

> limited to sedentary work . . . and that he could lift or carry, push or pull ten pounds at a time, could stand and walk two hours a day, sit six hours daily; could only occasionally climb, balance, stoop, kneel and crouch, and could never crawl or climb ladders, ropes or scaffolds, [and who was] limited to simple, routine tasks . . .

(Tr. 66).  The VE testified that such an individual could not perform McMurray's past work, but that there were other jobs in the national economy that such an individual could perform, including semi-conductor assembler (2,700 jobs in the region), clerical mailer (4,300 jobs) and order clerk (7,100 jobs).  (Tr. 66-67).  The ALJ then modified the hypothetical to include a limitation that the individual needs "frequent, unscheduled breaks in excess of normal tolerances" and would likely "be absent on a continuing basis two to three times a month."  (Tr. 67).  The VE testified that such limitations would preclude competitive employment.  (*Id.*).

### C.    Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

**D.     The ALJ's Findings**

Following the five-step sequential analysis, the ALJ concluded that McMurray was not disabled.  At Step One she found that McMurray had not engaged in substantial gainful activity

24

since his alleged onset date.  (Tr. 22).  At Step Two she found the following severe conditions: "degenerative disc disease of the cervical and lumbar spine, arthritis, obesity, depression, and chronic pain disorder."  (*Id.*).  At Step Three the ALJ determined that none of McMurray's conditions, either alone or in combination met or medically equaled a listed impairment, noting that she specifically considered Listings 1.02 (major dysfunction of a joint), 1.04 (disorders of the spine); 12.04 (affective disorders) and 12.07 (sotaform disorders).  (Tr. 23).  In analyzing McMurray's conditions under these listings, the ALJ determined that he had mild limitations in activities of daily living and social functioning, moderate limitations in the areas of concentration, persistence and pace, and no episodes of decompensation.  (Tr. 23-24).

Next the ALJ assessed McMurray's RFC, finding him capable of

> sedentary work . . . in that the claimant can lift and/or carry ten pounds, stand and/or walk two hours out of an eight-hour work day, sit six hours out of an eight-hour work day, and push and/or pull ten pounds.  The claimant is precluded from work requiring crawling, or climbing of ropes, ladders, and scaffolds.  The claimant is limited to work requiring only occasional climbing of stairs and ramps, balancing, stooping, kneeling, and crouching.  The claimant is also limited to simple, routine tasks.

(Tr. 24).  At Step Four, based on this RFC, the ALJ concluded that McMurray could not return to any of his past, relevant work.  (Tr. 29).  However, based on his age, education, vocational experience, and RFC, and with the assistance of VE testimony, the ALJ found that there were a significant number of other jobs in the national economy that McMurray could still perform.  (Tr. 29-30).  Therefore, the ALJ found McMurray not disabled.

### E.     Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the

Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).   In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence

submitted by a party.") (internal quotations omitted).   If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.    Analysis

McMurray alleges that the ALJ erred in numerous respects.   He first argues that the ALJ's decision cherry picks the record, and that a full review of all of Dr. Snow's pain management treatment notes reveals a consistent pattern of disabling pain, supporting Dr. Snow's opinion that McMurray could not work.   Second, he argues that the ALJ failed to properly account in her RFC for McMurray's moderate limitation in concentration, persistence and pace.   Third, he argues that the ALJ failed to account for his obesity in the decision.   Finally, McMurray argues that the ALJ did not properly assess his credibility in that she failed to consider his allegations of medication side effects.   The Court addresses each argument in turn.

### 1.    ALJ's Consideration of Entire Record and of Dr. Snow's Opinion

McMurray first argues that the ALJ did not consider the entire record, selectively discussing portions that were consistent with her conclusion that McMurray's condition was gradually improving.   While an ALJ is required by the regulations to consider the entire record on review, there is no requirement that she discuss every piece of evidence submitted.   *Daniels v. Comm'r of Soc. Sec.*, 152 Fed. Appx. 485, 489 (6th Cir. 2005).   An ALJ's failure to cite specific evidence does not mean she did not consider the evidence.   *Id.*; *see also Holt v. Comm'r of Soc. Sec.*, No. 12-2369, 2013 U.S. Dist. LEXIS 126064 (N.D. Ohio Aug. 6, 2013) *adopted by* 2013 U.S. Dist. LEXIS 126066 (N.D. Ohio Sept. 4, 2013) (affirming where ALJ stated that he

27

considered the entire record, even though not every piece of evidence was discussed).  The above detailed review of the record shows that the ALJ did not selectively "cherry pick" from the record, but rather painted an accurate picture of McMurray's progress.

In support of his argument that the ALJ only discussed those few records suggesting that McMurray's condition was improving, McMurray cites records from August and September 2008, where Dr. Snow diagnosed his conditions and performed nerve conduction tests.  (Plf. Brf. at 5).  He also cites portions of records from October 2009, and January through April 2010 where Dr. Snow documented an abnormal lumbosacral ROM and, in October 2009, noted deformity and crepitus in McMurray's left knee.  (*Id.*).  Finally, McMurray cites to the numerous times where Dr. Snow opined that McMurray could not engage in "meaningful work" due to his "multiple medical conditions which limit his ability to work."  (*Id.*).

While it is true that the ALJ did not specifically discuss all of Dr. Snow's records, her citation to the records and her finding that McMurray's condition gradually improved over time is consistent with Dr. Snow's treatment records as a whole, as they are fully discussed in this Report and Recommendation.  (*See supra pp.* 6-16).  As can be seen from the detailed discussion above, McMurray's condition, while somewhat rocky at the beginning, began to stabilize and improve of the course of his treatment with Dr. Snow such that by the beginning of 2009 he was starting to rate most of his pain at 2/10.  (*Id. pp.* 6-9).  While there were a few setbacks after that point, where McMurray rated his pain higher due to weather and other factors, Dr. Snow's management of his medications quickly remedied his increased pain to where by mid-2009 he was consistently rating his pain from 0-2/10, with an occasional twinge in one body part that he would rate a 4/10.  (*Id., pp.* 10-11).  While the ALJ ended her discussion of Dr. Snow's treatment notes with her February 2011 appointment, McMurray's condition subsequent to that date

28

generally continued to be stable or improve, and by September 2011, he reported engaging in exercise, helping a friend work on a car and doing "stuff around t[he] house." (*Id., pp.* 11-15). Therefore, although the ALJ did not discuss all of Dr. Snow's records, it is clear that her analysis of the pattern of McMurray's treatment with Dr. Snow was valid in that McMurray's condition during treatment gradually improved and his pain eventually was consistently reported as 0-2/10.

McMurray also argues that the ALJ's failure to consider the entire record led her to give improper weight to Dr. Snow's opinion that McMurray was incapable of work. When considering the medical evidence of record, an ALJ must give a treating physician's opinion controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) *quoting* 20 C.F.R. § 404.1527(d)(2). If an ALJ declines to give a treating physician's opinion controlling weight she must then determine how much weight to give the opinion, "by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) *citing Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(d)(2). The ALJ must give good reasons, supported by substantial evidence in the record, for the ultimate weight given to a treating source opinion. *Id.*, *citing Soc. Sec. Rul*. 96-2p, 1996 SSR LEXIS 9 at *12, 1996 WL 374188 at *5. An ALJ is not required to give any special weight to a treating source's conclusion that a claimant is disabled, as this conclusion is reserved to the Commissioner alone, based on all the evidence of record. 20 C.F. R. § 404.1527(e)(1), (e)(3).

Here, contrary to McMurray's argument, the ALJ did in fact consider Dr. Snow's opinion and gave it "some weight." (Tr. 29). However, she found it inconsistent with the agency definition of disability, and also found that it was contradicted not only by the consultative examination reports, but also by a number of Dr. Snow's own treatment records showing that McMurray's pain was regularly 0-2/10 with medication. (*Id.*). The ALJ concluded that while McMurray's pain was occasionally higher, "overall, the records do not support an inability to perform sedentary exertion with the limitations above." (*Id.*). For the same reasons discussed above, the Court finds that the ALJ properly considered Dr. Snow's opinion, and gave good reasons for the weight she ultimately assigned it. Because those good reasons are supported by substantial evidence of record, the ALJ's conclusion should not be disturbed.

### 2.   *Moderate Limitation in Concentration, Persistence and Pace*

Next, McMurray argues that the ALJ's RFC assessment failed to account for his moderate limitation in concentration, persistence and pace ("CPP"). McMurray's argument that the ALJ's RFC did not incorporate the moderate CPP limitation into her RFC at all is incorrect. The ALJ's RFC specifically limited McMurray to "simple, routine tasks." (Tr. 24). McMurray argues that the RFC should have included limitations addressing his alleged "difficulties with staying on task, keeping pace, or meeting quotas." (Plf. Brf. at 30). However, no such specific difficulties were present in the record before the ALJ. Here, while the reviewing physician and the ALJ both found a moderate limitation in CPP (Tr. 24; 334), the consulting examiner found "no severe impairment in ability to understand, carry out and remember instructions," and only "some subtle problems with mental shifting ability and attention and concentration." (Tr. 309). Moreover, the reviewing psychiatrist who completed the mental RFC concluded that McMurray was "able to perform unskilled work involving 1 and 2 step instructions with limited need for

30

sustained concentration," (Tr. 322), and was "able to perform unskilled work on a sustained basis." (Tr. 336).  There was no mention of quotas or pace, and any difficulty with staying on task was noted by the consulting examiner as only "subtle."   (Tr. 309).   Furthermore, McMurray's own subjective reports do not document problems with concentration, persistence or pace, as he himself reported no difficulties with paying attention or with listening to, reading or following directions.  (Tr. 176).  Similarly, the ALJ noted McMurray's representations that he is an avid poker player, *see supra* at 3, 13, 20-21, which requires a certain level of sustained concentration.   (Tr. 27).   In sum, the Court finds the ALJ imposed appropriate limitations supported by substantial evidence of record.[4]

### 3.      Obesity

Next, McMurray argues that the ALJ failed to give full consideration to limitations imposed by his obesity.  The Sixth Circuit has explained that "obesity, in combination with other impairments, 'may' increase the severity of the other limitations." *Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 412 (6th Cir. 2006) (quoting S.S.R. 02-01p, 2002 SSR LEXIS 1).  S.S.R. 02-01p however does not mandate a particular mode of analysis for an obese claimant.  *Bledsoe*, 165 Fed. Appx. at 412.  Nevertheless, an ALJ must explain her conclusions, if any, caused by obesity on a claimant's functional abilities.  S.S.R. 02-01p, 2002 SSR LEXIS 1 at *17.

Here, McMurray argues that the ALJ did not adequately account for his obesity, because,

---

[4] The Court also notes that McMurray does not argue that a limitation to "simple and routine tasks" does not fairly account for the reviewing physician's limitation to 1-2 step tasks and a limited need for sustained concentration, and the Court need not address that specific issue. *See Martinez v. Comm'r of Soc. Sec.* No. 09-13700, 2011 U.S. Dist. LEXIS 34436 at *7 (E.D. Mich. Mar. 2, 2011) *adopted by* 2011 U.S. Dist. LEXIS 34421 (E.D. Mich. Mar. 30, 2011) (noting that "[a] court is under no obligation to scour the record for errors not identified by a claimant" and "arguments not raised and supported in more than a perfunctory manner may be deemed waived") (citations omitted).  Nevertheless, for the same reasons discussed above, the Court finds that such an argument would fail.

while she found obesity to be a severe impairment, she did not incorporate limitations related to obesity into her RFC or into her hypothetical questions to the VE.  The Court disagrees that the ALJ erred in this respect.  The ALJ found McMurray's obesity to be a severe impairment.  (Tr. 22).  She then went on to cite various medical records that mentioned McMurray's weight and his attempts to diet and exercise.  (Tr. 26-28).  She also cited the only medical record that specifically discussed McMurray's weight in relation to his functional capacity, that of Dr. Lazzara, the consulting examiner, who opined that weight reduction would be of some benefit to McMurray as some of his issues appear to be related to his body habitus.  (Tr. 27-28; 301).  However, neither Dr. Lazzara nor any of McMurray's treating physicians noted or imposed any specific limitations on him related directly to his obesity, and instead made those determinations based on his underlying conditions and functional abilities.  *See Essary v. Comm'r of Soc. Sec.*, 114 Fed. Appx. 662, 667 (6th Cir. 2004) (citing *Forte v. Barnhart*, 377 F.3d 892, 896 (8th Cir. 2004) (rejecting plaintiff's "argument that the ALJ erred in failing to consider his obesity in assessing his RFC," explaining that, "[a]lthough his treating doctors noted that [plaintiff] was obese and should lose weight, none of them suggested his obesity imposed any additional work-related limitations, and he did not testify that his obesity imposed additional restrictions")).  Moreover, McMurray presented no other evidence of functional limitations stemming specifically from his obesity, and the ALJ limited him to sedentary work.

In sum, because the ALJ did not have before her any limitations imposed on McMurray as a result of his obesity, and because the RFC sufficiently accounted for the credible limitations imposed by McMurray's conditions, the ALJ's decision properly considered McMurray's obesity as required by the regulations.  *See Essary* 144 Fed. Appx. at 667 (holding that ALJ's failure to elaborate on issue of obesity beyond finding it a severe condition stemmed from fact

that plaintiff "failed to present evidence of any functional limitations resulting specifically from her obesity.").

### 4.   *Credibility and Allegations of Medication Side Effects*

Finally, McMurray takes issue with the ALJ's credibility analysis and her failure to account for his allegations of limitations from the side effects of his medications.  The Sixth Circuit has held that an ALJ is in the best position to observe a witness's demeanor and to make an appropriate evaluation as to his credibility.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).  Thus an ALJ's credibility determination will not be disturbed "absent compelling reason."  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  When a complaint of pain is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, she must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record" to determine if the claimant's claims regarding the level of his pain are credible.  *Soc. Sec. Rul.* 96-7, 1996 SSR LEXIS 4 at *3, 1996 WL 374186 (July 2, 1996); *see also* 20 C.F.R. § 404.1529.

Here, the ALJ properly assessed McMurray's credibility.  First, she specifically noted areas where the objective medical record contradicted McMurray's subjective reports, including where he admitted to being capable of performing activities such as laundry, meal preparation and shopping (even if he does not actually perform them).  (Tr. 27).  The ALJ further cited to three treatment records from appointments just days apart where McMurray reported disparate pain ratings (ranging from 0/10 to 8/10), despite the fact that at both appointments he noted having been out of unspecified medication for two months.  (*Id.*).  The ALJ also noted the

33

myriad medical records where McMurray consistently rated his pain 2/10 or 0/10 and other records which reflected a significantly greater level of activity by McMurray than he claimed he could engage in, all of which belied his allegations of disabling pain.  (Tr. 26-28).  Finally, the ALJ stated that she did not

> discount all of the claimant's complains; however, the evidence within the record demonstrates that even though[ ] the claimant does have a medically determinable impairment[,] it is not severe enough to prevent the claimant from participating in substantial gainful activity, given the residual functional capacity set forth above.  Given the objective medical evidence in the record, I find the claimant's residual functional capacity is reasonable, and that the claimant could function within those limitations without experiencing significant exacerbation of [his] symptoms.

(Tr. 29).  Thus, the ALJ found McMurray partially credible and concluded that the RFC encompassed all of his credible limitations.  The Court finds no clear error with this conclusion and recommends it be upheld.

Nor did the ALJ err in terms of her evaluation of allegations of side effects of McMurray's pain medication.  When evaluating a claimant's alleged symptoms, the regulations require an ALJ to consider, among other things, the "type, dosage, effectiveness and adverse side effect of any medication" taken to alleviate symptoms.  *See* 20 C.F.R. § 404.1529(c)(3)(iv).  However, unlike some of the other regulations, this regulation does not require the ALJ to explain his consideration of this factor in his written decision.  *Id.*; *see also Hale v. Comm'r of Soc. Sec.*, no. 10-10751, 2011 U.S. Dist. LEXIS 46865 at *8, 2011 WL 1641892 (E.D. Mich. May 2, 2011).

Here, the Court notes that that only evidence McMurray presents in support of any medication side effects was his own hearing testimony that his medications made him dizzy, and his comment to Dr. Snow in August 2008 that taking pain medication "messes with [the] mind." (Plf. Brf. at 12-13; Tr. 240).  In the record, the only additional mention of potential medication

side effects was McMurray's *speculation* to his therapist that his mental condition was likely the result of his pain and medication use and that without those he would likely not have a mental problem.  (Tr. 466).  On the other hand, the record is replete with instances where McMurray specifically denied any side effects to his medications, including in his initial reports with the Administration.  (*See* Tr. 148; 280; 284; 292; 339-41; 345; 348; 351; 355-57; 359; 369; 372-75; 390; 395; 403-404; 420; 440; 442-43; 450; 451-53; 461-63).  Therefore, the Court finds the ALJ did not err in not discussing McMurray's allegations of medication side effects.

 For all of the foregoing reasons, the Court finds that substantial evidence supports the ALJ's conclusion that McMurray is not disabled, and her decision should be affirmed.

## III. CONCLUSION

 For the foregoing reasons, the court **RECOMMENDS** that McMurray's Motion for Summary Judgment **[12]** be **DENIED**, the Commissioner's Motion **[16]** be **GRANTED** and this case be **AFFIRMED**.

Dated: January 27, 2014      s/David R. Grand
Ann Arbor, Michigan       DAVID R. GRAND
             United States Magistrate Judge

## <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

 Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991*); United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation.  *Willis v.*

*Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). A copy of any objection must be served upon this Magistrate Judge. E.D. Mich. LR 72.1(d)(2).

Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this Report and Recommendation to which it pertains. Not later than fourteen days after service of objections, **the non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc. The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page limitation.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 27, 2014.

s/Felicia M. Moses_____
FELICIA M. MOSES
Case Manager